## T. C. WALLACE v. THE STATE.

### No. 2704.   Decided June 8, 1904.

**1.—Statutes Construed—Bills of Exception—Change of Venue.**

The act of the Twenty-eight Legislature, p. 32, allowing bills of exception to be filed twenty days after the adjournment of the term of court, does not relate to, or affect article 621, Code of Criminal Procedure, regulating bills of exception, on the action of the court overruling the motion for change of venue, and such bills approved after adjournment of the court can not be considered under the twenty-day order to file general bills of exceptions.

**2.—Continuance—Diligence—Materiality.**

Where appellant appears to have used all reasonable diligence to procure his witnesses, and each of them, as shown in the application, will testify to circumstances on the development of the State's case shown to have been material in his defense, he was entitled to their presence and a continuance should have been granted him.

**3.—Same—Diligence.**

Where the case was brought to trial five days after the presentment of the indictment, and appellant shows that on the next day after the indictment was presented he had process issued for his witnesses, that same had been summoned but had not put in an appearance, and that as to others process had not been returned, the diligence used was sufficient.

**4.—Same—Materiality of Testimony.**

See opinion for materiality of the testimony of the absent witnesses.

**5.—Evidence—Hearsay.**

Where the State's case as to the particulars of the conspiracy and their scope depended mainly on the testimony of the wife of the deceased, who had conspired with one C. to kill her husband, it was error to admit her statement to State's witness M., made after the homicide, to the effect that witness should go to a certain place to look for deceased, and that he went and found the dead body of deceased where witness was told to look for it, the record showing that she had derived such knowledge from the defendant.

**6.—Same—Impression Not Evidence.**

Where the witness for the State was asked on cross-examination as to a conversation between deceased and one C., who was shown to have conspired with the wife of deceased to kill him, it was not error to refuse to admit such witness to state his impressions as to the friendly relations between the above named parties, the witness not remembering the language used between said parties.

**7.—Evidence—Conspiracy—Statements of Coconspirators.**

Where it is shown by the statement and testimony of the wife of the deceased, that appellant was a conspirator with her and one C. to kill her husband, the deceased, it was competent for the State to show, as against appellant, all that was said and done by C. and the said witness, wife of deceased, pending the conspiracy and in furtherance thereof.

**8.—Charge of the Court—Same.**

The court should have instructed the jury on trial of appellant of conspiracy to murder deceased, as to the rule of law with reference to the admission in evidence of the separate acts and declarations of coconspirators.

**9.—Evidence—As to Testimony that Others Committed the Offense.**

Where the testimony as to the question whether others than defendant committed the offense was too remote and did not tend in some degree to show that such other persons did the killing, it was proper to refuse to admit it, and it was therefore correct to refuse the admission of testimony that the deceased had certain enemies and that he apprehended harm from them.

**10.—Evidence—Corroborating and Impeaching Testimony.**

Where the State showed by witness T. that he saw defendant about the time of the homicide near the place where it occurred, and defendant, to

impeach this testimony, introduced witness S., who testified that the witness T. had told him he did not recognize defendant as the man he saw then and there, it was proper to allow the State to show by witness G. that T. told him, presumably before his statement to S., that he did recognize the defendant at the time and place stated.

**11.—Argument of Counsel—Defendant's Failure to Testify.**

It was against the rule: not to allude to defendant's failure to take the witness stand, for State's counsel in argument to say that the State had traced defendant in half a mile of the homicide, and that if he was not there, in God's name he should have told where he was, and other similar expressions, especially where it appears that the jury in their retirement commented on the fact that defendant failed to testify.

Appeal from the District Court of Franklin. Tried below before Hon. P. A. Turner.

Appeal from a conviction of murder in the first degree; penalty, death.

The testimony is very voluminous, being largely circumstantial, except as to the testimony of the wife of the deceased, who from her own testimony shows that she conspired with one A. J. Carbough and appellant to kill her husband, the deceased. Her testimony in chief is set out in the opinion, as also such other facts which illustrate the points at issue.

*J. F. Jones* and *J. H. Beavers,* for appellant.—After the defendant in a criminal case has made application for a continuance for the want of evidence of absent witnesses, and the said application is in compliance with the statute as to diligence used and materiality of evidence, and that the evidence expected by the absent witnesses is not entirely inconsistent and probably true, application should be granted, in the absence of a counter showing by the State that due diligence has not been used or that the absent witnesses could not be procured by a continuance and was out of the court's jurisdiction. The defendant should not be forced to trial. Miller v. State, 18 Texas Crim. App., 232; Parker v. State, 18 Texas Crim. App., 72; Smith v. State, 17 Texas Crim. App., 244.

After an application for a continuance has been overruled and the defendant convicted, if it appears upon the trial that the evidence of the absent witness named in the application was material and probably true, a new trial should be granted. Cox v. State, 5 Texas Crim. App., 118; Covey v. State, 5 S. W. Rep., 283; Cordway v. State, 8 S. W. Rep., 670.

The defendant can not be bound by the declaration or an assertion of an accomplice, when said conversation took place in his absence, especially so when there was no evidence showing any conspiracy between him and said accomplice. Hightower v. State, 22 Texas, 605; Arnold v. State, 9 Texas Crim. App., 435; Bookser v. State, 26 Texas Crim. App., 593.

The declarations of one, or two or more persons who are shown to have engaged in a common unlawful purpose, are not admissible in evidence against the others if made after the completion or abandonment of the unlawful purpose. Phillips v. State, 6 Texas Crim. App.; 364; Allan v. State, 8 Texas Crim. App., 67; Cox v. State, 8 Texas Crim.

App., 254; Price v. State, 40 S. W. Rep., 596; McKensie v. State, 44 S. W. Rep., 166; Conde v. State, 24 S. W. Rep., 415; Laud v. State, 30 S. W. Rep., 788.

The appellant assigns as an error the action of the court in refusing to allow the witness for the State, H. G. Haines, to testify on the stand, while on cross-examination, as to what impression the deceased, J. P. Austin and one H. J. Carbough's conversation, made upon him in reference to their friendship when Mr. Austin was at Haine's mill, the day before the killing, and insisted upon H. J. Carbough going home with him. The witness stated that he did not remember the exact words of the conversation, but did remember that Mr. Austin seemed very anxious for said Carbough to go home with him.

Appellant assigns as an error the action of the court in permitting the witness Mrs. Ella Johnson (formerly Austin), testifying on the witness stand in behalf of the State to conversations between the witness and the said Carbough before the killing, to the effect that he, Carbough, had employed T. C. Wallace (this defendant) to kill Austin and promised to give said Wallace $75 or $100; the objections to said testimony was that is was hearsay and from one conspirator talking to another conspirator about the third person who had entered into a conspiracy with one of the conspirators who was talking, and the person not present when the conspiracy was made. The court overruled the said objection and permitted witness to testify.

Conversations, statements and acts of third persons had, made and performed in the absence of the defendant, are ordinarily not admissible in evidence against or in his behalf, especially so in the absence of positive evidence establishing the conspiracy. Dungan v. State, 45 S. W. Rep., 19; Rhodes v. State, 45 S. W. Rep., 1009.

Previous trouble with and threats towards the deceased by another than defendant, where the defendant is charged with murder of the deceased, the defendant is entitled to the evidence of that fact for the purpose of showing that he might have been killed by the other party.

Where a witness is impeached by a contradictory statement as to the fact testified to by him, the adverse side is not entitled to the production of evidence as to statements made by him corroborating his testimony on the witness stand, unless the evidence used to corroborate his testimony shows to have been a statement made by him immediately after the transaction testified to by the witness; it must show that the corroborating statement was made subsequent and simultaneous to the occurrence.

Before a defendant in a criminal case can be bound by the acts and declarations of an accomplice, a conspiracy must be established by other evidence than the uncorroborated evidence of an accomplice, and the court should charge the jury that if they find from the evidence that the accomplices have been corroborated as to the formation of said conspiracy, then the defendant would be bound by the acts and declarations of said accomplices, but otherwise he would not be so bound.

A direct or indirect allusion of a prosecuting attorney in his arguments to the jury, to the failure of the defendant to testify, is a reversible error, or a remark as to the failure of the production of evidence by the defense, which remark would be such as to bring to the minds of the jury, or a reference to an unproven fact, which no one but the defendant could know, is such as should reverse a case when the defendant did not testify. Brazell v. State, 33 Texas Crim. Rep., 333; Washington v. State, 8 Texas Ct. Rep., 944.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, Judge.—Appellant was convicted of murder in the first degree, and his punishment assessed at death; and prosecutes this appeal.

The first error assigned is the action of the court overruling appellant's motion to change the venue. Several bills are presented to this action of the court; but all of these appear to have been presented and approved by the judge after the adjournment of the court. Appellant evidently assumed that he had a right to file his bills on this subject under the twenty-day order. This question was before this court in Lax v. State, 79 S. W. Rep., 578; and we there held, that the act of the Twenty-eighth Legislature, p. 32, allowing bills of exception to be filed twenty days after the adjournment of the term does not relate to or affect article 621, Code of Criminal Procedure, regulating bills of exception, on the action of the court overruling the motion for change of venue.

Appellant assigns as error the action of the court overruling his motion for continuance, and in overruling his motion for new trial based on this ground. Appellant based his motion to continue on account of the absence of Mrs. Minnie Dougle, said to reside in Lamar County; W. W. Smith, of Upshur County; Mrs. Margaret Dyer, of Franklin County; Mrs. Bill Martin; and I. Sparks, said to reside in Bowie County, In connection with appellant's diligence he recites the fact that the case was brought to trial five days after the presentation of the indictment, and he shows that on the next day after the indictment was presented he had process issued for said witnesses; that with reference to the witness Mrs. Dougle, the process had not been returned at the time of the trial; that W. W. Smith had been summoned by the sheriff of Upshur County, but had not put in an appearance; that Mrs. Dyer lived in Franklin County, about twelve miles from the county seat, and she had been served with process but was not present. It occurs to us that the diligence here used was sufficient. In the view we take of these witnesses and the testimony expected to be proved by them, we think that each of them was material on behalf of appellant. This was a case in which the murder alleged to have been committed by appellant occurred some five years before the trial, and his connection therewith depended almost entirely on circumstantial evidence. As to the witness

Sparks who was not served, the State introduced a number of witnesses showing appellant's proximity to the scene of the homicide on the Sunday evening when it occurred; and it was alleged that he expected to prove by said witness, on that day and about the time when the homicide should have occurred, he saw appellant near Mount Vernon—the killing having occurred twelve or thirteen miles north of said town. The court in connection with his action as to this witness says that "Sparks was an irresponsible negro and had not been in Franklin County for several years; that he was a transient negro." The fact of his responsibility, if by this is meant his veracity, was a question for the jury and not for the court; and there is no suggestion that appellant knew he was not in Franklin County. As to Mrs. Minnie Dougle, appellant shows that she was the daughter of Mrs. Johnson, who testified in the case, and who was at the time of the homicide the wife of deceased, Austin. The State proved by this witness, Mrs. Johnson, as shown by the application, that she was an accomplice with the murderer of her husband, and as an important fact against appellant, she testified that she was at home on the Sunday evening of the homicide, and that her daughter, who was a child some 12 years old, now Mrs. Minnie Dougle, was also at home. That after the homicide appellant came to her house, and told her that "Your man is down yonder; the work is done; the man is down yonder between the fields on the trail. You know me by Carbough." (Carbough being one of the conspirators.) Appellant desired the witness Mrs. Minnie Dougle to rebut the testimony of Mrs. Austin. He alleged that he expected to prove by said witness that she was at home with her mother on that day, and that appellant did not come there on that evening. The court in explanation of his action in overruling the motion as to this witness says, "that she has not lived in Lamar County for three years," but there is no statement that appellant knew the fact that she was not at the time a resident of Lamar County. He had been confined in jail after the examining trial for some months before the presentation of the indictment; and it is not shown that he could have ascertained within the limited time allowed him, the whereabouts of this witness.

Appellant states in his application that he expected to show by the witness Smith that State's witness Newsome would identify appellant by the clothing he wore on the Sunday night of the homicide, and that the witness Smith would testify to circumstances connected with said clothing tending to show that the witness Newsome was shown the clothes of appellant after that night, which enabled him to speak with reference to their kind and color, thus tending to affect the evidence of the witness Newsome in identifying appellant. We think this testimony was of a material character, and notwithstanding the court says he was an unreliable criminal and that the jailer would state the fact that he proposed to testify was not true, still this was a matter for the jury.

We also believe that the tetimony of Mrs. Margaret Dyer and Mrs. Bill Martin is also shown by the application to have been of a material

character. As stated above, appellant was forced into trial only five days after the indictment was presented against him, and he appears to have used all reasonable diligence to get said witnesses, and each of them, as shown in the application, will testify to circumstances on the development of the State's case, shown to have been material in his defense, and he was entitled to their presence. The court should have either postponed the case or have continued it in order to afford him an opportunity to secure their attendance.

We do not deem it necessary to discuss the action of the court which is assigned as error in the impanelment of the jury. While we have been unable to discover any error therein, the questions are not likely to occur again.

The State was permitted to prove by the witness Reddy Martin, as to Mrs. Ella Johnson, formerly Mrs. Austin (wife of deceased at the time of his death), that he saw her on Monday, deceased being missed on Sunday, the day before, and she then stated to him, "If you go to hunt deceased, if I were in your place and did go I would go the trail from the lake to the field." He went that way. This conversation was objected to by defendant because he was not present when it occurred; and because the killing, if any, had already occurred, and said conversation was calculated to prejudice the jury and injure the rights of the defendant. If it be conceded that this bill fairly raises the question presented by appellant in his brief, which is doubtful, we do not believe the testimony was admissible. The record discloses that Mrs. Johnson, who was at the time of the homicide Mrs. Austin, wife of deceased, had conspired with one A. J. Carbough to kill her husband, in order that she might marry Carbough; and that Carbough procured appellant to commit the homicide. The State's case as to the particulars of the conspiracy and the scope thereof mainly depend on the evidence of Mrs. Johnson. It is contended by the State that the above testimony, that is, the statement of Mrs. Johnson to witness Martin, would be a fact corroborative of her evidence, and so on that account was admissible, inasmuch as the body of the deceased was found where she told Martin to look for it, which would show knowledge on her part (which the record shows she must have derived from appellant) that the homicide was committed where she told Martin he would likely find the body. It occurs to us that on this very account the testimony was not admissible. It was tantamount, under the facts in this record, to the witness Martin testifying before the jury that Mrs. Johnson told him appellant had told her (which the record discloses he did) that he had slain deceased at the point where the body would be found. This was an indirect way of getting before the jury hearsay testimony of corroboration, to the injury of appellant.

H. G. Haines was introduced as a witness for the State, and the defendant claims that he was not permitted to prove on cross-examination, the impression produced on him from what Austin (deceased) and Carbough said in his presence as to their friendly relations. In this con-

nection it is said that the witness did not remember the language used between the parties. It does not occur to us that this would authorize the introduction in evidence of the impression produced on the witness, and the court did not err in excluding it.

Appellant reserved the following bill of exceptions: "While witness Mrs. Ella Johnson was on the witness stand, she was permitted to testify to conversations and transactions had between herself and H. J. Carbough, in words and substance, as follows: 'H. J. Carbough tried to get me to take the life of my husband some time during April of the year that he was killed. He wanted me to take the life of my husband so that he and I could marry. That was the purpose of getting rid of my husband. I refused to do so. This was in April. He never said any more about it for about a month or six weeks, in May or June of 1898. He then said in this other conversation that he would not do it himself, but would get some one that would. He said in the second conversation that he thought he knew where there was a man that he could get that would be all right. He told me afterwards he had secured the services of a man. It was a month or six weeks afterwards.. He told me there was a man at the sawmill by the name of T. C. Wallace and that he would be all right to do the work. The first conversation was in April, and then in about five or six weeks he told me he thought he knew of a man he could get, and then along about July of 1898, he told me that he thought he had a man that would do it. He said there was a man at the mill that would be all right, Mr. T. C. Wallace. He said he could get Wallace for seventy-five or a hundred dollars; he didn't know exactly. Carbough was at my house after that every once in a while, every month, or five or six weeks. He would come to see us. On the day that my husband was killed I was at Hagansport. We went there to church. I carried my children with me. Mr. Austin went off in the woods before I left home that morning, and was not there when I left. He went across to his field and said he was going over in the bottom. I left home on the 28th of August, Sunday morning, between 9 and 10 o'clock. I went to church. It is about a mile or a mile and a half from Hagansport to my house. After Carbough had told me that he had secured the services of T. C. Wallace, I told him that he had better leave it alone, that he would get into trouble. He said that it would be all right for that; Wallace was all right. I think that Carbough was at my house just about a week before Austin was killed, the Sunday before. He told me that the work would be done at most any time, and said for me not to let the oldest little boy go with his papa. I did not know for certain that my husband was going to be killed at the time he was. Carbough told me the week before that he was liable to be killed any time. I went to Mrs. Fleming's the day that I went to church. I do not remember exactly the time that I started home but it was about 5 o'clock or maybe after 5. I did not hear the report of the gun. The sun was about three-quarters of an hour high when I got home. We had no timepiece and I could not tell exactly. My children went home with me. I

did not find my husband when I got home. I did not see anyone that evening after I got home, except Mr. Wallace, the defendant. I had gone out to slop the hogs and he came along and spoke to me and said, 'I suppose you know me by what Carbough has told you. The work is done, and you will find your husband in the trail between the lake and the little field. You know me by what Carbough has told you. I am Mr. T. C. Wallace.' That defendant is the same man. He was on foot when he was at my house. He was very commonly dressed, and had on an old looking hat, and had a long bundle. I don't know what length it was, but something about this long [indicating the length with the hands]. It was wrapped in something like a sack. I never paid particular attention to it. He said those words to me that I have repeated and went on. There was no one else out there but me and Wallace. The children were there at the house or about the house. I stayed there at the house that night and the next morning went to Hagansport. Redding Martin was the first man that I met. Up to this time my husband had not returned. I asked Mr. Martin if he had seen anything of my husband, and he said he had not. I told him that he had not come home the night before and I wanted him to go and look for him, and told him that he might find him along the trail; that he said that he was going to the field, and he might find him somewhere over there; that he had gone this trail to the field across the lake. It was understood between Carbough and I the week before, on the Sunday that he was at my house, that we were to be married if we could get my husband out of the way. Carbough had come from Washington State down to this country after we came. After I met Mr. Martin I then went to Mrs. Fleming's, and then I went back home. I just stayed there a little bit at Mrs. Fleming's, and one of her nieces went home with me. My husband was brought home dead. They said that they had found him over there on that little trail, dead. I testified about this case four or five years ago. I did not tell what I knew then. Carbough insisted on my not telling it. After my husband was buried I moved to my father's in Delta County. I have an agreement from the State and promise from the State that I will not be prosecuted in this case if I will tell everything about it. I have an agreement with the State that if I tell the truth that I will not be prosecuted at all. I never saw Mr. Wallace till I saw him that evening after the killing. The reason I did not let my son go with my husband was because Mr. Carbough told me to keep him away from my husband, as he might be in the way and interfere with the killing. I did just as Mr. Carbough told me and kept my son from going with him. The reason why I consented to my husband being killed was because Mr. Carbough would not let me alone and I did it to get rid of him." The court, over the objection of the defendant, allowed this witness to testify to the above facts, and defendant urged as the reason why this testimony was not admissible against defendant Wallace, was "because no conspiracy had been shown between the defendant and Carbough to take the life of said J. P. Austin, and the proof further showed that defend-

ant, Wallace, did not know witness Mrs. Austin; never met her; never had a conversation with her until after the killing; and that if the testimony of the witness is true it shows a conspiracy between her and the said H. J. Carbough to take the life of the said J. P. Austin; and because said testimony is purely hearsay from one conspirator talking to another conspirator about a third person, whom the witness never saw, and does not know anything about." The court overruled the defendant's objections and the witness was allowed to testify to the facts above set out, to which ruling and action of the court, the defendant excepted only to the conversations between the witness and H. J. Carbough, what Carbough said and did and what the witness said and did in said conversations. We think it being thus shown that appellant was a conspirator with Mrs. Austin and 'Carbough, it was competent for the State to show as against him all that was said and done by Carbough and Mrs. Austin pending the conspiracy, and in furtherance thereof. We understand this to be the recognized doctrine under all the authorities. Preston v. State, 4 Texas Crim. App., 186; Cox v. State, 8 Texas Crim. App., 254; Smith v. State, 21 Texas Crim. App., 96. Some of them go farther than is required in this case, and when the conspiracy is once shown to have been formed, admit acts and declarations of coconspirators antedating the conspiracy. Stevens v. State, 42 Texas Crim. Rep., 154; Hudson v. State, 43 Texas Crim. Rep., 420; Hatcher v. State, 65 S. W. Rep., 97. I do not think it necessary here to discuss those cases, as the evidence here admitted comes within the rule laid down in the other cases cited, supra.

We believe the court should have instructed the jury in this connection that they could not find the conspiracy was established so far as appellant was concerned from the separate acts and declarations of others. But if they believed appellant entered into a conspiracy with the said parties for the purpose of killing deceased, Austin, that they could then consider all of the separate acts and declarations of such coconspirators made during its pendency and in furtherance thereof. If on the other hand they did not believe, or entertained a reasonable doubt that such conspiracy was established, to reject all facts and declarations of such other parties as against appellant. See Chapman v. State, 76 S. W. Rep., 477, 45 Texas Crim. Rep., 479, and authorities there cited.

We do not believe it was competent for the appellant to prove that deceased, Austin, had certain enemies, and that he was apprehensive of harm from them. The evidence was too remote; the rule being that before testimony of this character is admissible, the evidence must tend at least in some degree to show that such other person did the killing. The mere fact that other parties may have entertained feelings of hostility or ill will or had made threats against deceased, will not be sufficient. Murphy v. State, 36 Texas Crim. Rep., 24; Kunde v. State, 22 Texas Crim. App., 65.

Appellant objected to the testimony of witness Dock Graham, who was introduced by the State to support Bob Teague, another State's wit-

ness. It seems that Teague had testified he met Wallace (appellant) late on Sunday evening, the day Austin was killed, about a half mile from where the body of Austin was found; that the witness was going east and Wallace was traveling south; that he spoke to Wallace, but Wallace did not speak to him; "he kinder pulled his hat down over his eyes." In impeachment of this witness Teague, appellant introduced Shurtless, former district attorney of Franklin County, who testified that appellant was under a former indictment during the year 1899, and some time during that year he examined the witness Teague in regard to what he knew about the case; and Teague stated he saw a man late that Sunday evening about half a mile from where the body of Austin was found; that he was traveling east and the man was traveling south, but that he did not recognize him. After this the State introduced witness Graham, who testified that Bob Teague lived on his farm in the winter of 1899, and that he told him in that winter that he saw Wallace late on Sunday afternoon of the day Austin was killed, about half a mile from where the body of Austin was found, and that he (Teague) was going east, and Wallace was traveling south, and he spoke to Wallace, etc., as stated above. The court explains that this testimony was admitted for the purpose of supporting the witness Teague, and that he limited the testimony to that purpose. We think this was admissible under the authorities. See White's Ann. Code Crim. Proc., sec. 1119, subdiv. 4, for authorities. It does not appear clearly from the bill at what time these particular statements were made. If the witness Teague made the statement to Graham before the occasion about which Shurtless testified, then the supporting testimony appears to be admissible.

Appellant objected to that portion of the argument of the private prosecutor, W. E. Calvin, Esq., which appellant claims referred to appellant's failure to testify, as follows, to wit (as stated by appellant): "We have traced him in half mile of the homicide. If he was not there, why in the name of God can't he tell where he was?" However, the court explains this bill, by stating that the argument was as follows: "We have traced him from one-half mile of the place of the homicide to his home, eighteen miles from the place of the homicide. The killing occurred on Sunday, August 28, 1898. The defendant reached home the next Monday morning about 2 or 3 o'clock. Where was he on Sunday, the day of the homicide? He has failed to produce a single witness as to his whereabouts on that day." In the next bill it is shown that the district attorney used this language: "Defendant was at old man Henry's house about one month before the killing. Why was he there? Echo answers, why? No witness testified why. Why did the defendant send the gun back to town by old man Henry? No witness testifies why. Why did he not bring the gun home himself? Where did he go on Friday before the murder was committed? No witness testifies as to his whereabouts. Oh! where was Wallace on the 28th day of August, 1898? No one tells, and he is being tried for his life." And again he said further: "If Frank Jones and John Beavers, attorneys representing the

defendant, tell me where the defendant was on the 28th day of August, 1898, when Austin was killed, or if they will produce one credible witness who will tell where he was at that time, I will throw up my hands and the great State of Texas and quit the case." These bills show that the defendant did not testify, and it is claimed that these remarks referred to his failure to testify. It would appear from the authorities that these expressions violated our statute on the subject. Washington v. State, 8 Texas Ct. Rep., 944.

There are some objections urged to the misconduct of the jury in referring to appellant's failure to testify after they had retired to the jury room, which would emphasize the reference made in the argument above mentioned.

We do not deem it necessary to discuss other questions raised, as they are not such as are likely to occur on another trial. For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*